<u>**NOT FOR PUBLICATION**</u>                                               **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MILLBURN TOWNSHIP BOARD OF EDUCATION, | : : : | Civil Action No. 13-1208 (FSH) |
| Plaintiff, | : : | <u>**OPINION**</u> |
| v. | : : | |
| J.S.O. and K.S.O., *individually and on behalf of* A.C.S.O., | : : : | Date: July 21, 2014 |
| Defendants. | : : | |

<u>**HOCHBERG, District Judge:**</u>

This matter comes before the Court upon the parties' Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  The Millburn Township Board of Education ("the School District" or "Millburn") seeks review of an Administrative Law Judge ("ALJ") decision on claims brought pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq*.  The Court has considered the arguments of the parties without oral argument pursuant to Federal Rule of Civil Procedure 78.

### I.     BACKGROUND

In 2008, A.C.,[1] then two-years-old, began attending a private church preschool program.  In November 2008, at the suggestion of the church preschool teacher, A.C's parents requested an evaluation by the Child Study Team ("CST") of the Millburn Township Public Schools to determine whether A.C. was eligible for special education services.  The CST summarized their

---

[1] The parties and witnesses refer to the child as A.C. and A.C.S.O.  The Court uses A.C. herein.

evaluations in a report dated December 2, 2012.  (R-26).  The CST's report noted that A.C. had significant delays in receptive and expressive communication as well as social and cognitive skills.  (R-26).  The CST classified A.C. as preschool disabled and developed an Individualized Education Program ("IEP") placing her in the School District's half-day integrated preschool program.  Each class in the School District's integrated program includes an even mix of preschool disabled students and typically developing students.  A.C.'s parents signed the IEP on December 15, 2008 and A.C., then three-years-old, began attending the School District's integrated program in January 2009.

At a parent-teacher conference on February 6, 2009, the School District teachers expressed serious concerns about A.C.'s communication and social skills, including that she was not responding to her name, making eye contact, or acknowledging her classmates.  A.C.'s parents asked if they should take A.C. to the doctor and the School District staff responded that it would be a good idea.  (ECF No. 43-1, Tr. Sept. 12, 2011, 38:12-24).  A.C.'s pediatrician, Dr. Michelle Bender, made a preliminary autism diagnosis and referred A.C. to Dr. Elliot Grossman, a neurologist.  K.S.O., A.C.'s mother, contacted Bonnie Kessler ("Kessler"), the School District's learning consultant and A.C.'s case manager, and notified her of A.C.'s autism diagnosis.  (ECF No. 43-1, Tr. Sept. 12, 2011, 41:6-14).  On March 10, 2009, Dr. Grossman confirmed A.C.'s autism diagnosis at a severity level of seven out of ten.  (R-27) (ECF No. 43-1, Tr. Sept. 12, 2011, 44:15-23).  Dr. Grossman recommended an Applied Behavior Analysis ("ABA") program with parent training as well as a program with expertise in Autism.  (R-27).

After receiving Dr. Grossman's diagnosis, A.C.'s parents hired Dr. Anita Breslin, an expert in Autism and a Board Certified Behavior Analyst ("BCBA"), to evaluate A.C.'s educational needs.  ECF No. 43-1, Tr. Sept. 12, 2011, 49:5-24).  Dr. Breslin evaluated A.C. in

the integrated classroom and observed the School District's ABA program.  (P-6) (ECF No. 45, Tr. Nov. 15, 2011).  Dr. Breslin prepared a fifty-four-page report detailing her observations and recommending that A.C. attend an intensive year-round, 40-hour a week ABA program with home programming and parent training.  (P-6).  A.C.'s parents provided the School District with a copy of Dr. Breslin's Report on May 19, 2009, nine days before the May IEP meeting.

In April 2009, A.C.'s parents and the CST engaged in discussions about the possibility of A.C. attending the integrated program in the morning and the School District's ABA program in the afternoon.  On April 26, 2009, A.C. began participating in SEARCH consulting's ABA program on a part-time basis while still attending the School District's integrated program.  At the May 28, 2009 IEP meeting, the School District proposed A.C. be placed in its ABA program.  A.C.'s parents rejected the proposed IEP and removed A.C. from the School District's program that day.  Thereafter, A.C. attended SEARCH Consulting's program exclusively until the end of July 2009.  On July 28, 2009, A.C. began attending Somerset Hills Learning Institute ("SHLI"), a state-approved private school for children with autism that provides ABA-based education and services.  On July 30, 2009, A.C.'s parents sent the School District a ten-day notification letter advising the School District of their unilateral placement of A.C. at SHLI.

### a.  Administrative Proceedings

On June 19, 2009, A.C.'s parents filed a due process petition on A.C.'s behalf.  ALJ Caridad F. Rigo ("ALJ Rigo" or "ALJ") held twenty three days of hearings between April 2011 and July 2012.  ALJ Rigo reviewed 80 exhibits and heard testimony from 16 witnesses.  The following six witnesses testified for the parents: K.S.O. (A.C.'s mother); J.S.O. (A.C.'s father); Gina Green, Ph.D., BCBA-D; Anita Breslin, Ph.D., BCBA-D; Carrie Kahana, M.A., BCBA, executive director at SEARCH Consulting; and Caralyn Gaffney, special education teacher at

SHLI.  The School District called the following ten witnesses: Lisa Fabrizio, school social worker; Anne Faraher, M.A., BCBA, Lovaas Institute site director; Bonnie Jo Kessler, learning consultant; Julianna Kusz, director of special education services; Gail Miterman, preschool speech and language specialist; Laurie Paster, integrated preschool program teacher; Michele Sullivan, occupational therapist; Adrienne Fitzer, BCBA; and Janine Delaney, ABA program teacher.

On December 7, 2012, ALJ Rigo issued a decision that the Millburn School District failed to provide A.C. with a Free and Appropriate Public Education ("FAPE") and granted the parents' requests for reimbursement and compensatory education.  *J.S. and K.S. o/b/o A.S. v. Millburn Twp. Bd. of Educ.*, OAL Dkt No. EDS 11029-10.  Specifically, ALJ Rigo found that the School District's evaluations of A.C. in November and December of 2008 showed that she was exhibiting clear signs of autism.  By failing to look further into A.C.'s significant delays or suggest a neurological evaluation, ALJ Rigo found that the School District had failed to test A.C. in "all areas of suspected disability" as required by the IDEA.  *Id.* at 79; 20 U.S.C. § 1414(b)(3)(B); N.J.A.C.  6A:14-2.5(b)(7).  Absent proper evaluation, ALJ Rigo held that the December 15, 2008 IEP ("December IEP") "could not and did not offer A.C. any educational benefit" and that her placement in the integrated preschool program was inappropriate because she did not have the "prerequisite learning and social skills to benefit from interacting with her peers." *Id.* at 79-80.  Thus, ALJ Rigo concluded that the December IEP failed to provide A.C. with a FAPE.  ALJ Rigo granted the parents' request for compensatory education for the time A.C. was enrolled in the integrated program based on a determination that the School District should have known that A.C. was "receiving an inappropriate education." *Id.* at 80 (citing *Ridgewood Bd. Educ. v. N.E. ex rel M.E.*, 172 F.3d 238, 250 (3d Cir. 1999)).

ALJ Rigo also found that the May 28, 2009 IEP ("May IEP") did not provide A.C. with a FAPE because the goals could not be objectively measured, the placement was unreasonable, and the amount of parent training was inadequate. *Millburn*, OAL Dkt No. EDS 11029-10 at 81-82. Based on the finding that both the December IEP and May IEP failed to provide A.C. with a FAPE, ALJ Rigo granted the parents' request for reimbursement for their unilateral placement of A.C. at SEARCH consulting and SHLI as well as transportation costs. *Id.* at 82.

### b. Procedural History

On February 28, 2013 the Millburn School District appealed the ALJ's decision by filing a complaint in this Court. (Compl., ECF No. 1). On October 25, 2013, the School District filed a motion for summary judgment. (ECF No. 13). On November 18, 2013, the parents filed a cross-motion for summary judgment. (ECF No. 21).

## II.     STANDARD OF REVIEW

Under the IDEA, any party aggrieved by the findings of an administrative decision may seek review of the decision by a district court. The reviewing court shall receive the administrative record, "hear additional evidence" upon request, and base its decisions upon "the preponderance of the evidence," granting "such relief as the court determines appropriate." 20 U.S.C. § 1415(i)(2)(C). The party "challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

In IDEA cases, the district court decides motions for summary judgment based on the administrative record and such additional evidence as was proffered by the parties and received into evidence. *M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002). Accordingly, the standard of review is different from the typical summary judgment motion.

*M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007).  Instead, the "District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006); *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 271 (3d Cir. 2003) ("[F]actual findings from the administrative proceedings are to be considered *prima facie* correct.").  The purpose of affording "due weight" to the administrative proceedings is to prevent the courts from imposing "their own notions of sound education policy." *See Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Ctny. v. Rowley*, 458 U.S. 176, 206 (1982)).

Under the "due weight" standard, the Court is required "to consider – although not necessarily to accept – the administrative fact findings." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995).  If the Court departs from the ALJ's findings, it must find factual support in the record and "fully explain[] its reasons for departing from the state decision." *S.H.*, 336 F.3d at 270-71.  Credibility determinations by the ALJ, who heard live testimony, are entitled to special weight "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (emphasis in original) (quoting *Carlisle*, 62 F.3d at 529).  The ALJ's legal determinations, however, are reviewed *de novo*. *See*, *e.g.*, *P.N. v. Greco*, 282 F. Supp. 2d 221, 235 (D.N.J. 2003).

III.    **IDEA FRAMEWORK**

In enacting the IDEA, Congress required all states receiving federal education funding to provide every disabled student in their districts with a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and

prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009). To accomplish this, school districts must create a program for each "handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Ctny. v. Rowley*, 458 U.S. 176, 188-89 (1982). School districts achieve this goal by first evaluating the student, and then discussing the results in a meeting with the student's parents, teachers, and a curriculum specialist from the local school district. 20 U.S.C. § 1414(d)(1)(B). After consulting with the parents, the school district must implement an Individualized Education Program ("IEP"). 20 U.S.C. §§ 1412(a), 1414(d). "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589 (3d Cir. 2000). The IEP must provide a "basic floor of opportunity" and not necessarily the "optimal level of services." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 533-34 (3d Cir. 1995). But an IEP that merely provides "more than a trivial benefit" is not sufficient. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999). Instead, it must provide a plan reasonably calculated to confer "significant learning" and "meaningful benefit." *Id.* In deciding whether the school district has offered the opportunity for meaningful benefit, "adequate consideration" must be given to the intellectual potential of the individual student to determine if he is receiving a FAPE, requiring a "student-by-student analysis that carefully considers the student's individual abilities." *Id.* at 248.

To the greatest extent possible, there is a strong preference for placing the special education student within the general education population, providing aids and services without

removing them from their neighborhood school.  20 U.S.C. § 1412(a)(5)(A).  This requirement, often called "mainstreaming," is part of the school district's obligation to offer an education in the "least restrictive environment."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556-57 (3d Cir. 2010).  In determining whether the student has been sufficiently integrated in a mainstream environment, courts apply a two-part test:  first, "whether the child can be educated in a regular classroom with supplementary aids and services;" and second, "whether the school has mainstreamed to the maximum extent appropriate."  *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1215-16 (3d Cir. 1993).

Parents who are not satisfied with the placement or services that the school district is offering may challenge the IEP through a due process petition, presenting their arguments at an administrative hearing before an ALJ.  20 U.S.C. § 1415(b)(6), (k).  If a hearing officer determines that a school district failed to provide the student an appropriate education, the parents may seek several different remedies based on the circumstances.  If the school district denied the student the services required while attending public school, the ALJ may order the school district to provide additional services prospectively and compensatory education to make up for the earlier deprivation.  *See N.E.*, 172 F.3d at 249.  If the parents sought private therapy, the school district may be ordered to reimburse them for the cost of necessary therapy by qualified personnel.  *See Bucks Cnty. Dept. of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 67 (3d Cir. 2004).  Parents who withdrew their child from public school because the school district failed to offer a FAPE and then placed their child in an appropriate private school may be reimbursed for the cost of the child's private education and related expenses.  *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389-90 (3d Cir. 2006); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).

## IV.    DISCUSSION

The issues presently before the Court are whether the ALJ properly found that (a) the School District failed to evaluate A.C. in all areas of suspected disability; (b) the December IEP failed to provide A.C. with a FAPE; (c) the May IEP failed to provide A.C. with a FAPE; and (d) the parents were entitled to the full cost of reimbursement.

### a.    Adequacy of the School District's Initial Evaluation of A.C.

As the ALJ detailed in her Opinion, under the IDEA, the first step for providing a disabled child with a FAPE is a procedural one:  the child must be assessed in all areas of suspected disability.  20 U.S.C. § 1415; 20 U.S.C. § 1414(b)(3)(B); N.J.A.C. 6A:14-2.5(b)(7). According to the ALJ, this was not done.  *Millburn*, OAL Dkt No. EDS 11029-10 at 79.  The ALJ determined that the School District's evaluations of A.C. in November and December of 2008 showed that she was exhibiting clear signs of autism.  *Id.* at 73.  Specifically, the ALJ found that the evaluations "showed that A.C. had substantial delays in the areas of receptive and expressive communication, social, play, adaptive, pre-academic and cognitive skills, short attention span, had poor eye contact, occasionally responded to her name, rarely answered questions, and had difficulty following simple directions."  *Id.*  For comparison, the ALJ cited to Exhibit P-23, the diagnostic criteria for Autistic Disorder from *Diagnostic and Statistical Manual of Mental Disorders: DSM IV*.

The School District argues that the ALJ erred by disregarding critical facts and evidence concerning the School District's evaluation of A.C.  (Dist.'s Br. at 3).  According to the School District, the evidence demonstrates A.C. did not exhibit signs of autism based on the information available at the time.  (Dist.'s Br. at 4).  The School District asserts that the ALJ failed to consider that the Summit Medical Group's speech evaluation (R-24) revealed that A.C. was

performing in the normal range and that A.C.'s parents had reported that she was a good eater and sleeper and could follow two-step commands, recognize the meaning of new words, and persist in a task for an extended period of time.  (Dist.'s Br. at 4).  The School District also claims the ALJ disregarded the allegedly undisputed fact that A.C.'s pediatrician never expressed developmental concerns or referred A.C. for Early Intervention Services.  (Dist.'s Br. at 4).  In addition, the School District asserts that the ALJ failed to consider the testimony and documentary evidence presented by Lisa Fabrizio, A.C.'s case manager and Kessler, the School District's learning consultant.  (Dist.'s Br. at 4).

In contrast, Defendant parents, on behalf of A.C., ("Defendants" or "parents") argue that the ALJ properly determined that the School District failed to evaluate A.C. in all areas of suspected disability.  (Defs.' Br. at 8).  Defendants assert that the ALJ's conclusion was supported by the testimony provided by A.C.'s parents and a number of autism experts and Board Certified Behavior Analysts, including Dr. Breslin, Dr. Gina Green, and Carrie Kahana. (Defs.' Br. at 9).  Defendants contend that the ALJ's determination is also supported by the letter A.C.'s parents sent to the School District requesting an evaluation (R-1); the Summit Medical Group's report (R-24); the CST's evaluation report (R-26); the DSM-IV diagnostic criteria for autism (P-23); and the reports prepared by Defendants' expert witnesses (P-4, P-6, P-7, P-11, P-15).  (Defs. Br. at 9).

This Court "is required give due weight to the factual findings of the ALJ." *Ramsey*, 435 F.3d at 389.  If the Court departs from the ALJ's findings, it must find factual support in the record and "fully explain[] its reasons for departing from the state decision." *S.H.*, 336 F.3d at 270-71.  Credibility determinations by the ALJ, who heard live testimony, are entitled to special weight "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary

conclusion." *Shore Reg'l*, 381 F.3d at 199 (emphasis in original) (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)).

The Court does not find a sufficient basis in the above proffered evidence to depart from the ALJ's factual determination that the information presented to and evaluated by the CST in November and December 2008 showed A.C. was exhibiting signs of autism. The ALJ's fact findings are supported by the preponderance of the evidence. The most striking of that evidence is the CST's own preschool evaluation report dated December 2, 2008 ("CST Report"). (R-26). The CST Report notes that A.C.'s teachers at the private church preschool said she does "not acknowledge anyone at the preschool when she comes in" and has only intermittent eye contact. (R-26 at 2). They also noted that her speech is "inconsistent" and mostly "unintelligible" and that she "lacks focus." (R-26 at 5).

The CST's own observations of A.C. in her previous preschool program showed that A.C. did not respond to teacher instructions or participate in class activities. (R-26 at 5-6). Instead, A.C. would walk around the room and lie down on the floor. *Id.* The CST also recorded that A.C. spoke "gibberish," did not interact with her peers, and made only "fleeting eye contact." (R-26 at 6-7). In addition, the CST noted that A.C. repeatedly licked or placed non-food objects in her mouth and engaged in scripting when she was overwhelmed.[2] (R-26 at 4-6, 9).

The test results discussed in the CST Report also support the ALJ's determination. They show that A.C. was delayed in many areas, most significantly in receptive and expressive communication, cognitive perception, and peer interaction. (R-26 at 7). A.C.'s scores showed that she functioned at the level of a ten-month-old in receptive communication, a two-year-old in

---

[2] Several witnesses referred to A.C. "scripting." When "scripting," A.C. would recite the dialog from episodes of *Dora the Explorer*.

expressive communication and a nine-month-old in cognitive perception and concepts.  *Id.* Overall, the CST Report concluded that A.C.'s weaknesses were in the areas of "socialization" and "speech."  (R-26 at 4).

The diagnostic criteria for Autistic Disorder provide that "the essential features of Autistic Disorder are the presence of markedly abnormal or impaired development in social interaction and communication."  (P-23 at 70).  Other signs of autism include:  not making eye contact; failure to develop peer relationships or participate in simple social play; delays in language expression and comprehension; and the use of idiosyncratic language.  (P-23).  These deficiencies in communication and socialization are precisely the weaknesses described in the CST's Report and referenced in the ALJ's decision.

Dr. Breslin, an autism expert and BCBA, confirmed in her testimony that "socialization and language delays are key indicators" of autism.  (ECF No. 45, Tr. Nov. 15, 2011, 172:3-4). Dr. Breslin also noted that scripting, licking and mouthing non-food objects, unintelligible speech, and other examples of A.C.'s unusual behavior recorded in the CST Report are all potential indicators of autism and are particularly concerning when considered together.  (ECF No. 45, Tr. Nov. 15, 2011, pp. 155-194).  In addition, Dr. Breslin noted in her report that A.C. demonstrated "skill deficits in language and social interaction as well as excessive behavior patterns" prior to and during the CST's evaluations that were indicative of autism and could not be explained by the use of two languages at home as suggested by members of the CST.  (P-6 at 5).

The School District attempts to rely on the Summit Medical Group's speech report from June 2008 to support its argument that AC did not exhibit signs of autism at the time of the CST's evaluation.  (R-24).  However, the speech report is not strong evidence.  Although the

report concludes that A.C. "presents with age-appropriate receptive and language skills," a close analysis of the report shows that the grounds for this determination are weak.  (R-24 at 1).  First, the examiner noted that A.C.'s attention to tasks is "limited for a child her age" and the preschool language test could not be administered because of A.C.'s "inattentiveness and lack of interest."  (R-24 at 1).  Instead, the examiner used a parent questionnaire and asked A.C.'s parents about A.C.'s language skills.  (R-24 at 1).  Thus, much of the analysis is not based on direct observation, but on the impressions of A.C.'s parents.  Further, the examiner noted that A.C. demonstrated few of the skills reported by her parents during the evaluation, showed difficulty engaging in joint play, and "produced long, unintelligible strings of utterances."  (R-24 at 2).  The report ultimately concluded that A.C's receptive and expressive language skills "fell within the 25-36 month age range."  (R-24 at 1).

The School District also argues that the ALJ disregarded the fact that A.C.'s pediatrician never expressed developmental concerns or referred A.C. for early intervention services.  (Dist.'s Br. at 4).  However, the CST had performed testing, made its own observations, and had access to the observations and evaluations of others, consisting of significantly more data than a pediatrician would have access to at a short annual physical check-up.

The School District also relies on an alleged statement made by A.C.'s parents during a CST meeting that their pediatrician had ruled out autism.  (Dist.'s Br. at 5).  However, the parents testified that they never made this statement.  (ECF No. 43-1, Tr. Sept. 12, 2011, 20:23-25, 21:1-4).  The Court is required to give special weight to the credibility determinations made by the ALJ, who heard live testimony, "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion."  Here, the ALJ heard both the testimony of the parents and the members of the CST and chose not to include the alleged statement in its

analysis.  The School District has pointed to no non-testimonial evidence of sufficient weight to show that the ALJ erred on this fact issue.  For the same reasons, the School District's argument that the ALJ disregarded the testimony of Lisa Fabrizio and Kessler is unpersuasive.  The ALJ simply chose to give more credence to Defendants' witnesses in a case where both sides had credible evidence to present, and the ALJ did her job to decide which side carried its burden of proof.

The School District argues that if the Court were to affirm the ALJ's decision on this issue, it would create a heightened standard that would require CSTs to immediately refer all three year olds presenting with language and social delays to a neurologist.  (Dist.'s Br. at 24).  The Court disagrees.  Each special education case is based on a set of highly particularized facts relevant to one individual, the affected disabled student.  The job of the ALJ is to apply the correct standard of proof in deciding whether the CST acted correctly based on the information available at the time to that CST.  Here, the ALJ made detailed findings of fact that A.C. presented with significant language and social delays, exhibited other unusual behavior indicative of autism, and concluded that the combination of these indicators, considered in the aggregate, should have put the CST on notice of a potential autism diagnosis and led them to further investigate that concern.  Whether or not a referral to a neurologist would necessarily be required under the IDEA would be dependent on the severity of the delays, the presence of other autism indicators, and the particular facts surrounding the actions of the CST, the exhibited behavior of the student, and the nature and results of evaluations.  The ALJ did not make a decision beyond the scope of the particular facts about this child's presenting symptoms and the response of this CST to those indicia of potential autism, and no broader rule is stated by this Court in affirming the ALJ here.

The School District also disputes the ALJ's fact finding that the School District's initial evaluations of A.C showed that she was exhibiting clear markers of autism.  However, the ALJ's conclusion is supported by the CST's own evaluation report (R-26), the parents' testimony, and the testimony and documentary evidence provided by expert witnesses.  The School District has not presented persuasive evidence to the contrary.  The Court affirms the ALJ's conclusion that the School District did not meet the IDEA's procedural requirement that students be tested in "all areas of suspected disability."

### b.  IEP:  December 25, 2008

There is a two-part inquiry for determining whether a school district provided a FAPE: 1) whether the school district complied with the IDEA's procedural requirements and 2) whether the IEP is "reasonably calculated to enable the child to receive education benefits."  *Rowley*, 458 U.S. at 207.  A satisfactory IEP must provide "significant learning" and confer "meaningful benefit."  *Ridgewood*, 172 F.3d at 247.  To determine whether a meaningful benefit has been conferred, the court must engage in a "student-by-student analysis that carefully considers the student's individual abilities."  *Id.* at 248.

The December IEP placed A.C. in the School District's integrated preschool program and provided for speech and language services twice a week for a total of sixty minutes.  (R-29).  The ALJ found that "[w]ithout evaluative information that A.C. is on the Autism spectrum," the IEP team could not develop an IEP that would offer A.C. any meaningful benefit.  *Millburn*, OAL Dkt No. EDS 11029-10 at 79-81.  Specifically, the ALJ found that A.C., a three-year-old with severe delays, did not have "the prerequisite learning and social skills to benefit from interacting with her peers."  *Id.* at 79-80.  Thus, the ALJ concluded that the December IEP's placement of A.C. in an integrated preschool program was inappropriate.  *Id.* at 80.

The School District argues that the ALJ ignored testimonial evidence presented by Laurie Paster, A.C.'s teacher in the integrated program, and Gail Miterman, A.C.'s speech therapist, that A.C. was making improvements in a number of areas.  (Dist.'s Br. at 6-7).  The School District also asserts that the ALJ disregarded the emails sent by A.C.'s mother to School District staff expressing her delight with A.C.'s progress.

It is the ALJ's job to consider and weigh the competing evidence.  There is no evidence that the ALJ disregarded the School District's positive evidence, but rather that the ALJ weighed the totality of the evidence in making the finding, supported by sufficient evidence in the record, that A.C. was not making meaningful progress in the integrated program.  For example, Dr. Breslin observed A.C. in the integrated program on April 22, 2009.  (P-6 at 9).  At this point, A.C. had been in the program for over three months.  Dr. Breslin reported that A.C. did not make eye contact or interact with her peers; engaged in self-talk and made verbalizations without communicative intent; engaged in verbal scripting; wandered off from activities and had to be redirected; laid or crawled on the floor; did not engage in appropriate play behavior in contrast to her peers; required far more attention from the teacher and aides than the other students; and failed to attend to the teacher or answer questions.  (P-6 at 9-21).  Dr. Breslin also notes in her report that Terry Santora confirmed that this type of behavior was typical for A.C.  (P-6 at 16, 19).

Dr. Breslin's observations are strikingly similar to those made by A.C.'s church preschool teachers and CST members in A.C.'s initial evaluation six months prior and thus demonstrate that A.C. was not progressing in a meaningful way.  (*See* R-26).  This evidence supports the ALJ's conclusions, particularly in light of the weight accorded to the ALJ's

credibility findings.  The Court finds no reason to depart from the ALJ's determination.[3]

A preponderance of the evidence supports the ALJ's conclusion that A.C. did not have the requisite skills to derive meaningful benefit from an integrated classroom.  Thus, the Court affirms the ALJ's determination that the December IEP failed to provide A.C. with a FAPE.

### c.  IEP:  May 28, 2009

The May IEP placed A.C. in the School District's self-contained ABA program and provided for weekly sessions with a speech language specialist and an occupational therapist. (R-30).  The May IEP also offered "parent training as necessary and as part of the team meetings which occur every 3 weeks for a minimum of 1-2 hours a session."  (R-30).  The ALJ determined that the May IEP was "vague" especially as to whether A.C. would be spending any time in the integrated classroom.  *Millburn*, OAL Dkt No. EDS 11029-10 at 76.  The ALJ pointed out that the IEP provided A.C. "the opportunity to integrate with typically developing peers yet there was no program for A.C. to develop social skills."  *Id.*  The ALJ also found that there were no "parameters to measure how and if A.C. achieved the goals and objectives stated in the IEP."  *Id.* In addition, the ALJ concluded that the parent training provided in the IEP was inadequate given the severity of A.C.'s disability and her maladaptive behaviors.  *Id.*  On these grounds, the ALJ held that the May IEP was inadequate and failed to provide A.C. with a FAPE.  *Id.* at 82.

The School District first takes issue with the ALJ's finding that "[t]here is no difference in the December 2008 IEP – when the diagnosis of Autism was not known – from the IEP of

_____

[3] While the School District asserts that the ALJ disregarded the IEP team's responsibility to develop a program that is not diagnosis driven but rather designed to meet student needs, (Dist.'s Br. at 25) (citing *J.B. & G.B. o/b/o I.B. v. Westwood Reg'l Bd. of Educ.*, OAL Dkt. No. EDS 01754-10 (Mar. 10, 2011) (programming is based on student needs and does not rely on labels or whether a school district has ascribed a diagnosis to a student)), the Court does not find the ALJ's ruling to be solely diagnosis driven.  Rather, the ALJ's holding is grounded in the fact finding that the integrated program was not appropriate for a child without the language or social skills to benefit from interacting with her peers.  *Millburn*, OAL Dkt No. EDS 11029-10 at 80.

May 2009, knowing that A.C. has severe to moderate Autism." *Id.* at 76.  A reading of the two IEPs shows that there are differences between the documents.  *Compare* (R-29) *with* (R-30). However, much of the language in the May IEP remains identical to that of the December IEP, and it is a close call whether there is a meaningful difference between the two IEPs.  The Court finds that the ALJ's single sentence exaggerating the similarities between the IEPs is not material to the ALJ's decision or a sufficient reason to overturn it.  In addition to this sentence, the ALJ provided a number of specific reasons for rejecting the May IEP.  It is the legitimacy of these other reasons that are material to the primary issue:  the adequacy of the May IEP.

Multiple expert witnesses testified that A.C. required a true ABA program in order to meaningfully benefit from her education.  These witnesses, who had observed the School District's ABA program, concluded that it was not a true ABA program.  For example, Dr. Green described the program as "an eclectic mixture of some ABA methods" and other non-evidence based methods.  (*See* P-11 at 12; P-29).  Dr. Breslin concluded that the program was deficient because the methods were applied inconsistently, there was no home programming component, and it was not supervised by full-time behaviorist.  (P-6 at 45-47).

Although a school district is not required to maximize a child's educational benefit, Defendants' experts provided testimony and supporting research to demonstrate that a true ABA program with intensive parent training was the only way A.C. could receive meaningful benefit from her education at this critical stage of her development.  In accepting this argument, the ALJ found Defendants' expert witnesses to be more credible than the School District's.  The Court accords this credibility determination weight.  Accordingly, the Court affirms the ALJ's finding that A.C.'s May IEP did not provide the child with a FAPE because it did not reflect A.C.'s

placement in a true ABA program.[4]

### d.  Parents' Entitlement to Full Cost of Reimbursement

The School District asserts that the Court erred by not reducing or denying the cost of reimbursement to Defendants for acting unreasonably and in bad faith.  *See R.P. & V.P. o/b/o E.P. v. Ramsey Bd. of Educ.*, OAL Dkt. No. EDS 11682-04 (Sept. 5, 2006); N.J.A.C. 6A:14-2.10(c)(4).  The School District argues that Defendants acted in bad faith by failing to disclose a medical evaluation to the School District, consulting with a parent advocate and exploring other programs without notice to the School District, and "withholding" Dr. Grossman's report. (Dist.'s Br. at 37-39).

The School District alleges that the Defendants failed to disclose Dr. Prontnicki's February 25, 2009 evaluation to the School District.  However, Defendants testified that they had already informed the School District of the pediatrician's autism diagnosis and never received a report from Dr. Prontnicki.  The School District also asserts that Defendants purposely withheld Dr. Grossman's report because he examined A.C. on March 10, 2009 and the School District did not receive a copy of his report until April 23, 2009.  However, Defendants testified that they did not receive Dr. Grossman's report themselves until a few days before they provided it to the School District.  In any event, the School District received the report with more than enough time to review it prior to the May 28, 2009 IEP.

The School District contends that Defendants' failure to immediately disclose that they

---

[4] The Court also notes that a significant portion of the School District's briefing is dedicated to the type of education it could have offered A.C.  But in determining whether an IEP is appropriate, the Court's focus is on the IEP actually offered and not on one the School District could have provided.  *Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.*, 116 N.J. 30, 46, 560 A.2d 1180, 1189 (1989) ("We also conclude that in determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined.").

had hired an advocate and were exploring other programs is evidence of bad faith.   However, there is evidence in the record that Defendants did provide notice to the School District that they had hired Dr. Breslin, placed A.C. at SEARCH Consulting on a part-time basis, and later placed A.C. at SHLI.   For example, the School District clearly knew about Dr. Breslin as she communicated with School District staff and observed School District programs on numerous occasions in connection with A.C.'s education.   In addition, Defendants sent the School District ten-day notification letters when they placed A.C. at SEARCH and later at SHLI.   Defendants sent the SEARCH notice letter less than two weeks after A.C. started receiving part-time services there and the SHLI letter less than a week after A.C. had been accepted into the program.   (Def.'s Br. at 3-4).   While better coordination, fuller disclosure, and less animosity should have been demonstrated here, the ALJ is in the best position to determine issues of bad-faith manipulation of the process, and there is not sufficiently strong evidence of hiding the ball to reverse the finding that evidence of bad faith is lacking.[5]   Accordingly, the Court affirms the ALJ's finding that the parents are entitled to the full cost of reimbursement.

## V.   CONCLUSION

For the foregoing reasons, the ALJ's Opinion is **AFFIRMED**.   Millburn's motion for summary judgment is **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED**.   An appropriate order will follow.

---

[5] For example, the School District makes much of the "fact" that A.C.'s parents admitted that Dr. Breslin recommended relocating A.C. prior to observing the School District's ABA program. (*See, e.g.*, Dist.'s Br. at 38-39).   However, a careful review of the record shows that (i) A.C.'s parents testified that they did not decide to withdraw A.C. from the School District prior to Dr. Breslin's observations of the program (ECF No. 49-2, Tr. July 27, 2012, 57:24-59:6), and (ii) Dr. Breslin testified that she believed the parents were mistaken when they testified that Dr. Breslin recommended removal from the School District prior to her observations of the ABA program, that she did not advise the parents one way or the other as to keeping A.C. in private or public school at that time, and that she only recommend taking A.C. out of an integrated preschool classroom at that time (ECF No. 48-1, Tr. May 31, 2012, 255:23-258:18).

SO ORDERED.

**/s/ Faith S. Hochberg**_____
**Hon. Faith S. Hochberg, U.S.D.J.**